IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SEAERRA D. LEFLORE, *on behalf of S.L.* (minor child) ) ) ) | Case No. 1:23-cv-01746 |
| ) | MAGISTRATE JUDGE |
| Plaintiff, ) | REUBEN J. SHEPERD |
| ) | |
| v. ) | |
| ) | |
| COMISSIONER OF SOCIAL SECURITY, ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendant. ) | |

**I.      Introduction**

Plaintiff, Seaerra D. Leflore ("Leflore"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income ("SSI") on behalf of her minor child, S.L., under Title XVI of the Social Security Act. Leflore raises one issue on review of the Administrative Law Judge's ("ALJ") decision, arguing that the ALJ erred in her determination that S.L.'s severe impairment of Attention Deficit/Hyperactivity Disorder ("ADHD") did not functionally equal a listing. This matter is before me pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c)(1). (ECF Docs. 15, 16). I find substantial evidence supports the ALJ's decision and because Leflore has failed to identify any error of law in the ALJ's evaluation of S.L.'s case, the Commissioner's final decision is affirmed.

**II.      Procedural History**

Leflore applied for SSI benefits on behalf of her minor child, S.L., on November 20, 2019. (Tr. 64). After an initial hearing on April 19, 2022, the ALJ issued a decision denying Leflore's claim for benefits on June 17, 2022. (Tr.18). On July 27, 2023, the Appeals Counsel

1

denied further review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 5). Leflore timely instituted this action on January 3, 2024 to obtain judicial review of the Commissioner's final decision. (ECF Doc. 1).

### III. Evidence

#### A. Personal Evidence

S.L. was born on September 14, 2011. (Tr. 63). Under Social Security regulations, she was a school-aged child at the time the application was filed and at the time of the ALJ decision. (Tr. 18).

#### B. Medical and Educational Evidence

The record shows a limited history of medical treatment. On April 10, 2019, S.L. presented to the emergency department complaining of left eye pain and a "mouth bump." (Tr. 311). Exam notes indicate that she appeared atraumatic, with no bruising, swelling or crepitus. (Tr. 312-13). There was a 1 cm fluctuant abscess noted on the lower gum that was treated with incision and drainage. (Tr. 313). S.L. was then discharged. (*Id.*).

On August 25, 2019, S.L. presented to the emergency department complaining of left wrist and head injuries sustained when she was accidentally pushed off of a top bunk by her sibling. (Tr. 307). S.L. reported landing on her outstretched left wrist and hitting her head on the ground. (*Id.*). She reported no loss of consciousness, vomiting or vision changes. She was experiencing a mild frontal headache. (*Id.*). An x-ray of her left wrist showed a Salter-Harris II fracture involving the dorsal distal left radial metaphysis with overlying soft tissue swelling. (Tr. 315).

On August 27, 2019, S.L. received follow up care for her wrist. (Tr. 305-07). Another x-ray showed there was satisfactory alignment of the fracture. (Tr. 306). She was placed in a long

arm cast with recommended follow-up in two to three weeks to consider placing a short arm cast, and to determine the need for manipulation due to fracture drift. (*Id.*).

S.L.'s academic records show that she had performed well in school as a third grader, which corresponds to the filing of this claim. Her grades as a third grader were generally A's, B's or C's, although she had one failing grade. (Tr. 270-71). As a fourth grader, S.L.'s grades dropped precipitously, as she was failing all classes other than physical education. (Tr. 268-69). Notably, although her attendance was poor as a third grader, with 34 instances of tardiness or unexcused absence documented, her attendance in fourth grade was abysmal, with a record of 126 unexcused absences. (Tr. 272-75). There is no indication in the records of a success plan, an "at-risk" plan, a 504 plan, or an Individualized Education Plan ("IEP"). (Tr. 265). The record notes several disciplinary offenses and actions that took place between October 11, 2019 and April 11, 2022. (Tr. 280-81).

  C. **Medical Opinion Evidence**

    1. **State Agency Reviewers**

On September 1, 2020, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed the record and opined that S.L. had a "marked" limitation for attending and completing tasks, a "less than marked" limitation for acquiring and using information, interacting and relating with others, and caring for yourself. (Tr. 66-67). She had no limitation in moving about and manipulating objects or in health and physical well-being. *(Id.)*. On February 23, 2021, state agency psychologist Robyn Murry-Hoffman, Psy.D., adopted the findings of Dr. Haskins. (Tr. 72-74).

##### 2. Consultative Examination Report

S.L. was seen by psychological consultative examiner ("CE"), Bryan Krabbe, Psy.D., on August 27, 2020 when S.L. was 8 years old. (Tr. 289-94). Leflore reported to the CE that S.L. was a full-term baby who generally met milestones on an average time frame. (Tr. 290). S.L. is the fourth of Leflore's five children, and currently resides with her mother and siblings. (*Id.*). At the time of the assessment, S.L.'s father was incarcerated and had no contact with her. (*Id.*). S.L. had been in her grandmother's custody for four years as Leflore addressed her own domestic violence situation. (*Id.*). Leflore further reported that S.L. was in the fourth grade, and that she was receiving special education services and had an IEP.[1] (*Id.*). S.L. generally received poor grades and had difficulty maintaining focus. (*Id.*). S.L. was able to get along with her teachers but tended to stay to herself around her peers. (*Id.*). She had a history of disciplinary problems in school, including instances of not listening, being disruptive, playing with friends, and not participating. (*Id.*).

Leflore endorsed a history of mental health care for S.L., including counseling services through school and the Murtis Taylor Center.[2] (*Id.*). S.L. is not prescribed any psychoactive medication. (*Id.*). There is a family history of ADHD, including S.L.'s sister. (Tr. 290-91). Leflore noted that S.L. cannot sit still, gets bored, and that she does not listen. (Tr. 291). Leflore endorsed further symptoms including carelessness, frequent mistakes, poor attention, and concentration, not listening, lack of follow through, disorganization, messiness, forgetfulness,

---

[1] No IEP is included within the educational records submitted for this case, nor is there any supporting evidence that such an IEP exists.
[2] No records of mental health treatment have been submitted. Efforts to locate such records appear to have proven unsuccessful.

frequently losing things, distractibility, fidgeting, impulsivity, tantrums, sensitivity to rejection, social withdrawal, insomnia, angry outbursts, and restlessness. (*Id.*).

Although the exam was conducted via telehealth, Dr. Krabbe was able to discern fidgeting, though S.L. remained seated in her chair. (*Id.*). She was marginally cooperative, and rapport was difficult to establish. (*Id.*). S.L.'s engagement was below average, and she displayed variable interest in activities. (*Id.*). Dr. Krabbe noted conversational speed within normal limits and 100% intelligible articulation. (*Id.*). Her receptive language skills may have been below average in that she had difficulty attending to instructions, but that may have been more a product of emotional factors. (*Id.*). Her thought processes were clear and logical. (*Id.*).

S.L. had difficulty following oral instructions during a mental status examination and required several questions to be repeated. (Tr. 292). As to age-appropriate abilities:

- She was unable to state her age.
- She was unable to state the day of the week.
- She was unable to point to her eyes, ears, and nose.
- She was unable to name several colors of the rainbow.
- She did not know the month that comes after March.
- She was unable to name two types of coins.
- She did not know how many days were in a week.
- She did not know the four seasons.
- She was unable to perform basic addition or subtraction.
- She was unable to perform basic multiplication.
- In terms of immediate memory, she recalled zero digits forward or backward.
- In terms of short-term memory, she was able to recall zero of three words after a short delay.

5

- In terms of long-term memory, she was able to describe what she did yesterday.

- In terms of attention and concentration she was unable to count backwards from 20 to 1.

- On a slightly simpler task of attention and concentration, she was unable to recite the alphabet.

- In terms of abstract reasoning ability, she was asked to describe similarities between two words and scored in the below average range.

(*Id.*).

Dr. Krabbe opined that S.L. functions below the normal limits of mental status, although he noted that "[r]esults should be viewed with some caution as she was marginally engaged. She appeared to smile and intentionally point to the wrong body parts when asked. Other times, she seemed to have real difficulty understanding instructions." (*Id.*). Dr. Krabbe diagnosed S.L. with Unspecified ADHD. (Tr. 293).

Dr. Krabbe's assessment is that S.L. functions in the below average range with regard to acquiring and using information. (*Id.*). He further assessed that she did not display effective task persistence when answering questions and provided variable effort, noting that she had difficulty understanding the examiner and following instructions. (*Id.*). As to attending to and completing tasks, Dr. Krabbe noted that S.L. did not display effective task persistence, and that she provided variable effort. (*Id.*). She showed indications of distraction throughout the evaluation. (*Id.*). He noted she has regular problems with attention and concentration at school and at home, with impulsive behavior, easy distractibility and restlessness. (Tr. 293-94). With regard to interacting and relating with others, Dr. Krabbe noted that S.L.'s symptoms of impulsivity and inattentiveness may interfere with her ability to get along with others. (Tr. 294). In the domain of self-care, Dr. Krabbe assessed age-appropriate management of several aspects of self-care, but

6

also less than age-appropriate ability to regulate her emotions including frequent temper tantrums and multiple occasions of disciplinary actions at school. (*Id.*).

### D. Hearing Testimony

At the hearing on April 19, 2022, only Leflore offered testimony. (Tr. 31-52). Leflore testified that S.L. is the fourth oldest of her five children, with all five of the children and Leflore residing in the home. (Tr. 38). S.L. does not get along with any of her siblings, noting that S.L. is often "picking with" the other children. (Tr. 39). At times the children's fights become physical. (*Id.*). S.L. has also gotten into trouble, and been injured, while fighting at school. (Tr. 40). S.L. will sometimes perform her chore of cleaning her room, but there are times when she is on TikTok and does not want to clean up. (Tr. 41). S.L. will sometimes do her homework, sometimes not, and she will sometimes lie about having homework. (*Id.*). Her grades are not good, and she was held back once in fourth grade and likely will be again this year. (*Id.*). S.L. has been in in-house detention three times for "cussing out the teacher and then aggressiveness." (Tr. 42).

Leflore testified that S.L. has one friend at school and one friend out of school. (Tr. 43). When asked about medication for ADHD, Leflore testified she had been reaching out to Murtis Taylor but due to being switched between case managers she had been unable to secure medications, and further, due to COVID, she had been unable to schedule an appointment for S.L. (Tr. 43-44).

Leflore testified that she has tried to teach S.L. certain chores, such as loading clothes into the washing machine, but S.L. struggled to learn the necessary steps. (Tr. 45-47). Leflore testified that S.L. is reading at the second-grade level, and that she needs help with TikTok videos on her phone. (Tr. 47). She has, however, made TikTok videos with her friend. (Tr. 48).

7

Leflore has to oversee S.L. showering, because if she did not do so, S.L. would only turn on the water and not get in to clean herself. (*Id.*). The same is true with regard to brushing her hair or teeth. (Tr. 48-49). S.L. will not typically engage in conversations with Leflore. (Tr. 49).

Leflore testified that S.L. is attending Mary B. Martin school, and that she would soon be able to provide an update on an IEP. (Tr. 50).

### IV. The ALJ's Decision

In her July 17, 2022 decision the ALJ made the following findings:

1. The claimant was born on September 14, 2011. Therefore, she was a school-age child on November 20, 2019, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since November 19, 2019, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairment: attention deficit hyperactivity disorder (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since November 20, 2019, the date the application was filed (20 CFR 416.924(a)).

(Tr. 18-25). Based on the foregoing, the ALJ determined that S.L. had not been under a disability, as defined in the Social Security Act, from November 20, 2019, through the date of the decision. (Tr. 25).

8

V.      Law & Analysis

   A.      Standard for Disability

To qualify for SSI benefits, "(a)n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(c). At Step One, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R § 404, Subpt. P, App'x 1. 20 C.F.R. § 416.924(d).

To make the three-step determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). Alternately, to make a Step Three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The relevant six domains of functioning to be considered

9

are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

VI.     Discussion

    A.     **Plaintiff's Arguments**

Leflore argues that the ALJ erred in her determination that S.L.'s severe impairment of ADHD did not functionally equal a listing. (ECF Doc. 11, PageID 396). The ALJ determined that S.L. had a marked limitation in attending and completing tasks, with a less than marked limitation in acquiring and using information; in interacting and relating to others; and, in the ability to care for herself. (*Id.* at PageID 398). Leflore argues that the ALJ failed to properly consider the CE's opinion with regard to acquiring and using information. (*Id.* at PageID 396-99). Leflore notes the CE found that S.L. functioned in the below average range compared to typically developing peers and argues that the ALJ focused too heavily on concerns that S.L. deliberately answered questions incorrectly during the examination. (*Id.* at PageID 399). Leflore further argues that the ALJ failed to explain her consideration of supportability and consistency factors relative to the CE's opinion and did not provide a logical bridge between the evidence and the CE's conclusions. (*Id.* at PageID 400-01).

11

### B. Substantial Evidence Supports the ALJ's Determination that S.L. Was Not Markedly Limited in Her Ability to Acquire and Use Information.

Leflore's claims that the ALJ erred are limited. There appears to be no dispute as to whether S.L. has engaged in substantial gainful activity, or whether S.L. suffered from a severe impairment. The only matter Leflore raises on behalf of her minor daughter relates to the ALJ's finding that S.L.'s impairments did not functionally equal the severity of the Listings. (ECF Doc. 11, PageID 396). Leflore notes the ALJ's finding concerning the six relevant domains, but challenges only one: that S.L. had less than a marked limitation in acquiring and using information. (*Id.* at PageID 398). Because I find that the ALJ's finding on the single domain in question was supported by substantial evidence, the ALJ's final decision is affirmed. As the finding concerning only one domain was raised by Leflore, the remainder of this analysis will be limited to its discussion and all other claims will be deemed waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

A child's disability is "functionally equal" to the severity of a disability Listing when she has a marked limitation in at least two of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r,* 348 F.3d 124, 127 (6th Cir. 2003). A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to initiate, sustain or complete activities." 20 C.F.R § 416.926a(a), e(2).

Here, the ALJ found that S.L. had no extreme limitations and only one marked limitation – in the ability to attend and complete tasks. (Tr. 20). Because only one marked limitation was found, the ALJ concluded that S.L.'s impairments did not functionally equal the severity of any Listing. Leflore argues that S.L. has a marked limitation in two domains: "attending and completing tasks" and "acquiring and using information." (ECF Doc. 11, PageID 11-13). The Commissioner disagrees, arguing that substantial evidence supported the ALJ's finding that S.L.

had a less than marked limitation in the domain of acquiring and using information. (ECF Doc. 13, PageID 5-11).

The domain of acquiring and using information involves the "the child's ability to learn information and to think about and use the information[,]" but the domain considers more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school." SSR 09-3p, 2009 WL 396025, 203 (S.S.A.). An ALJs should consider whether the claimant has poor grades, inconsistent school performance, or special education services. *Id.* at *3. The ALJ may also consider the claimant's school attendance. *See* 20 C.F.R. § 416.924a(b)(7)(iv-v) (describing special education, accommodations, attendance and participation considerations for children). For school-age children, examples of relevant criteria include the ability to learn reading, writing, and simple arithmetic; interest in new subjects and activities; demonstrating learning by "producing oral and written projects, solving arithmetic problems taking tests, doing group work, and entering into class discussions[;]" applying learning in daily activities (like reading street signs, telling the time, and making change); and using increasingly complex language. *See* SSR 09-3p, 2009 WL 396025 at *5.

In finding that S.L.'s limitations did not rise to a marked level in the domain of acquiring and using information, the ALJ engaged in a thorough analysis and evaluation of the CE's opinion, including consideration of the factors of supportability and consistency. When evaluating medical opinion evidence, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. *Id.* at §§ 404.1520c(b), 416.920c(b). The ALJ is required only to say enough to allow this Court to trace the path of the reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.,* 451 F. App'x 517, 519 (6th Cir. 2011).

13

I find the ALJ has done so here. The ALJ specifically wrote that after careful consideration of the evidence, "the allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 21). The ALJ referenced indications in the CE's report that S.L. "was fidgety upon examination" and "no more than marginally cooperative" and "that rapport was difficult to establish." (*Id.*). The ALJ recognized that the CE felt S.L.'s receptive language skills possibly fell below average "in that she had difficulty attending to instructions, but her thought processes were clear and logical." (*Id.*). The ALJ also noted that:

> The claimant was unable to state her age, the days of the week, point to her eyes, ears and nose, name the colors of the rainbow, state the month that comes after March, name two coins, know how many days are in the week, or name the four seasons of the year. She was unable to perform basic addition, subtraction or multiplication. In terms of immediate memory, she recalled zero digits forward and zero digits backward. In terms of short-term memory, she recalled zero of three words after a brief delay, and in terms of long memory, she was able to describe what she did the day prior. In terms of attention and concentration, she was unable to count backwards from 20 to 1 or recite the alphabet. Additionally, her abstract reasoning abilities were below average. Based on these results, the claimant appeared to function below normal limits of mental status.

(Tr. 22). However, the ALJ further noted that the CE indicated that the results "should be viewed with some caution as she was marginally engaged. While she seemed to deliberately answer incorrectly at time, she seemed to have real difficulty understanding the instructions at other times." (*Id.*).

The ALJ looked to S.L.'s school records to assess the supportability and consistency of the CE's findings, noting that her grades were all in the passing range in third grade, but one, as compared to her failing grades in all fourth-grade subjects save physical education. (Tr. 22-23). The ALJ further referenced S.L.'s attendance records, which showed 34 unexcused absences and

tardy arrivals in the time frame corresponding to third grade, as compared to 126 unexcused absences during fourth grade. (Tr. 23). The ALJ also noted that S.L.'s school records from her fourth-grade year reflect that she had no 504 plan or Student Success plan at that time. (*Id*). The ALJ also considered the opinions of State agency consultants, Kristin Haskins, Psy.D. and Robyn Murry-Hoffman, Psy.D., each of whom determined that S.L. had a less than marked limitation for acquiring and using information and found their opinions to be persuasive as each was "consistent with and supported by the previously summarized findings." (Tr. 24).

      The ALJ's evidentiary findings in support of her "less than marked" finding for acquiring and using information clearly meet the substantial evidence standard. Records showing reasonable grades while S.L. was in third grade suggest she was capable of performing well in school. It is also not coincidental that her failing grades would correspond to having 126 unexcused absences during her fourth-grade year. It seems unlikely that any child would excel with such a record of truancy, and this fact renders the significance of her poor marks in fourth grade unreliable for purposes of this analysis. Similarly, reasonable questions raised about the level of engagement displayed by S.L. during the consultative exam are particularly concerning when compared to her level of performance in the third grade, and the lack of a Student Success plan or 504 plan. The CE noted that S.L. appeared to smile and intentionally point to the wrong body parts when asked, creating a reasonable perception that her performance during the exam did not reflect her full capabilities. Additionally, the CE's finding that S.L.'s functionality in this domain was in the "below average range" corresponds with the findings of the State agency experts who deemed her functioning as "less than marked" and shows that there is consistency amongst those who opined. Accordingly, it is clear that the ALJ properly considered the evidence in this case and drew the necessary accurate and logical bridge to her conclusion.

It is possible that the facts involved in this case could lead to differing conclusions depending on how the evidence is weighed. A focus solely on poor school performance during S.L.'s fourth grade year, without accounting for the impact of rampant absenteeism, and a heavier reliance on certain of S.L.'s responses to the CE, could lead to a different outcome. In such a circumstance, the statutory scheme envisions a "zone of choice" within which the Commissioner could go either way, without interference by the courts. *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (C.A.6 (Ky.), 2009). I conclude that I am not permitted to interfere with the Commissioner's final decision, even if alternative outcomes are imaginable. I further find that the ALJ properly considered the evidence in making her findings, specifically with regard to the domain of acquiring and using information, and that her findings were supported by substantial evidence. The ALJ's decision denying Leflore's claim on behalf of her minor daughter, S.L., is thus AFFIRMED.

### VII.     Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I affirm the Commissioner's final decision denying Leflore's claim on behalf of her minor daughter, S.L.

Dated: May 30, 2024

Reuben J. Sheperd
United States Magistrate Judge